**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| AUTOMATIC FIRE CONTROLS, INC., Plaintiff, | ) | Case No. |
| v. | ) | JURY TRIAL DEMANDED |
| THOMAS SWISHER and FIRE DETECTION CONSULTANTS PLLC, Defendants. | ) | |

**COMPLAINT**

Plaintiff, Automatic Fire Controls, Inc. ("AFC"), by its attorneys, Barnes & Thornburg LLP, for its Complaint against Thomas Swisher ("Swisher") and Fire Detection Consultants PLLC ("FDC," together with Swisher, "Defendants"), states as follows:

**NATURE OF THE ACTION AND RELIEF SOUGHT**

1. AFC brings this action against Thomas Swisher, its former Project Manager, and Fire Detection Consultants PLLC, a competing fire-protection business that Swisher formed and obtained licenses for while still employed by AFC.

2. After Swisher abruptly resigned on June 15, 2026, AFC discovered that project files containing AFC's confidential business information were missing and that the AFC-issued computer and cell phone used by Swisher had been wiped of substantially all user-accessible data before being returned. A forensic examination revealed that deletion of data from the computer began at approximately 6:04 a.m., two minutes after Swisher submitted his resignation.

3. AFC asserts claims against Swisher for breach of fiduciary duty, misappropriation of trade secrets, conversion of tangible AFC property, and unauthorized deletion or destruction of AFC data, and against FDC for misappropriation of trade secrets. AFC seeks to stop continued use

or disclosure of AFC Trade Secrets, recover tangible AFC property, and recover the relief available under each applicable claim.

## THE PARTIES

4. Plaintiff, Automatic Fire Controls, Inc., is an Illinois corporation with its principal place of business at 8940 W 192nd Street, Unit M, Mokena, IL 60448.

5. On information and belief, Defendant Thomas Swisher is an individual residing at 4200 Chelsea Manor Circle, Aurora, Illinois 60504.

6. On information and belief, Defendant Fire Detection Consultants PLLC is an entity associated with the address 1204 Cleveland Street, Lockport, Illinois 60441. Swisher formed FDC and, at all relevant times, owned, controlled, managed, operated, or otherwise materially participated in its business and affairs.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because AFC brings claims arising under the laws of the United States, including the Defend Trade Secrets Act, 18 U.S.C. § 1836 et seq., and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030. This Court has supplemental jurisdiction over the related state-law claims pursuant to 28 U.S.C. § 1367(a).

8. This Court has personal jurisdiction over Swisher because Swisher is domiciled in Illinois and resides in this District.

9. This Court has personal jurisdiction over FDC because FDC transacts business in Illinois, maintains an address in this District, and committed or participated in acts giving rise to AFC's claims in Illinois.

10. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because all Defendants reside in Illinois and Swisher resides in this District. FDC is subject to personal

jurisdiction in this District and, therefore, resides in this District for venue purposes under 28 U.S.C. § 1391(c)(2).

11. Venue is also proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to AFC's claims occurred in this District. Among other things, Swisher worked for AFC in this District, accessed AFC's confidential information and property through that employment, formed and operated a competing business associated with an address in this District, and deleted or destroyed AFC's data in this District. AFC's principal place of business and a substantial portion of the property and business information at issue are also located in this District.

## FACTS COMMON TO ALL COUNTS

**Swisher's Employment and Access to AFC Information**

12. AFC provides fire-protection, alarm, detection, installation, design, service, and related services to commercial and institutional customers.

13. AFC's business depends on nonpublic information concerning its projects, customers, pricing strategies, vendor relationships, referral sources, and business opportunities, which are not generally known to AFC's competitors.

14. AFC employed Swisher as a Project Manager from August 1, 2021, through June 15, 2026.

15. As a Project Manager, Swisher was entrusted with quoting, designing, ordering parts, and overseeing subcontractors for projects that AFC obtained and developed. This position gave Swisher access to AFC's nonpublic business information.

16. W.W. Grainger, Inc. ("Grainger") is a referral source and billing agent for AFC project services. Grainger refers fire-protection opportunities to AFC and, for certain projects, serves as a billing agent by receiving customer purchase orders, processing invoices and payments,

and performing related administrative activities. AFC remains responsible for performing the project services.

17. AFC has developed the Grainger relationship over a number of years, and that relationship generates significant revenue and customer opportunities for AFC.

**Swisher's Formation and Licensing of a Competing Business**

18. While Swisher remained employed by AFC and continued receiving compensation, bonuses, and benefits from AFC, Swisher formed a competing entity, Fire Detection Consultants PLLC, on March 13, 2025.

19. Ryan Schaff, a former AFC technician, co-founded FDC with Swisher and is identified in FDC's articles of organization as participating in FDC's formation, ownership, management, or operations.

20. Swisher obtained an Illinois Private Alarm Contractor License on April 1, 2025.

21. FDC obtained an Illinois Alarm Contractor Agency License on September 4, 2025, enabling FDC to conduct business as a fire-protection company in Illinois.

22. FDC obtained a Florida fire alarm license on March 2, 2026, and an Arizona Fire Alarm License on April 13, 2026.

23. The timing of these licensing milestones corresponded with a marked slowdown in Swisher's development of AFC projects, including Grainger-sourced leads.

24. In or around March 2025, during the term of his employment, Swisher or Schaff created or acquired the website https://www.firedetectionconsultants.com/ and, on information and belief, launched the website publicly on June 16, 2026, the day after his resignation. According to the website, FDC offers the same fire protection-related services as AFC.

**The Suncoast Credit Union Opportunity**

25. Approximately one month before Swisher's resignation, AFC sent Swisher, in his capacity as an AFC employee, to Florida to survey 72 sites for a potential client, Suncoast Credit Union. This was an AFC business opportunity.

26. After the survey, Swisher contacted the individual who generated the lead and told her that AFC would be "too expensive" and unlikely to obtain the work.

**The Buckman Laboratories Inc. Opportunity, Missing Files, and Other AFC Property**

27. Buckman Laboratories Inc. ("Buckman") is an AFC client that AFC services through its business relationship with Grainger.

28. AFC's work for Buckman was a significant, multi-year engagement that generated substantial revenue for AFC and included substantial potential follow-on project opportunities.

29. While employed by AFC, Swisher was assigned to manage the Buckman account on behalf of AFC.

30. During his employment with AFC, Swisher created, maintained, and had access to project files for Buckman.

31. During 2025, Swisher prepared at least four quotes for Buckman projects totaling over $3 million, including:

a. an August 25, 2025 quote for replacement of underground supply piping;

b. a September 23, 2025 quote for five-year deficiency repairs;

c. a November 23, 2025 quote to replace an existing wireless fire alarm system; and

d. a November 24, 2025 quote to commence replacement of above-ground sprinkler piping.

32. Despite these quotes, AFC's Buckman work slowed after July 2025, and AFC performed only two Buckman projects in 2026, in February and April.

33. AFC never received purchase orders for several significant quoted Buckman projects.

34. When AFC asked Swisher about the status of Buckman projects in late 2025, Swisher became evasive.

35. On June 15, 2026, at approximately 6:02 a.m., Swisher submitted his immediate resignation to AFC.

36. Following Swisher's resignation, AFC discovered that multiple hard-copy project files were missing from its offices, and specifically from Swisher's office. The missing files included AFC's project files for Buckman.

**The Wiped Company Devices and Recovered Evidence**

37. While employed as a Project Manager at AFC, AFC provided Swisher with a company laptop and company cell phone for his work.

38. After Swisher's resignation, AFC discovered that the company laptop and company cell phone had been wiped or cleared of data before Swisher returned them.

39. After discovering that the devices had been wiped, AFC retained Iron Oak Discovery Inc. to provide forensic collection and analysis services concerning AFC's company devices and data.

40. The forensic examination revealed that deletion of data from the company laptop began on June 16, 2026, at approximately 6:04 a.m., two minutes after Swisher submitted his immediate resignation at approximately 6:02 a.m. The laptop was returned to its factory settings, and it contained no recoverable data whatsoever.

41. Although AFC's forensic recovery from Swisher's company cell phone yielded only limited data, the recovered data included text messages and related materials concerning Buckman-related project communications and vendor activity.

42. Recovered cell phone data shows that on April 22, 2026, a Ferguson representative texted Swisher about whether he would be on site that morning for the Cadet strainer job. Swisher responded by identifying Nathan or Peyton as on-site contacts who could show where the material was located. Ferguson then issued an invoice dated April 22, 2026 for material shipped to AFC at the Cadet, Missouri Buckman site. A charge made on April 23, 2026, by Swisher using his AFC company credit at the Home Depot in Festus, Missouri, the closest major hardware store to Buckman's Cadet Missouri site, corresponded with the timing of that work. AFC has not located records showing that the Cadet strainer work was opened or processed through AFC or billed for AFC's benefit.

43. Recovered phone data also shows that on April 29, 2026, a representative of Buckman asked Swisher to send the prior year's five-year fire-system report for a sprinkler system internal pipe inspection, and Swisher responded that he would send it. Because the devices had been wiped, AFC no longer had access through those devices to that report or other reports maintained or accessed by Swisher.

44. Recovered phone data further shows that on June 8, 2026, one week before Swisher's resignation, Ryan Schaff texted Swisher, "You need anything else from the warehouse?" At the time of this communication, Swisher remained employed by AFC and had access to AFC's warehouse, tools, equipment, and materials.

**COUNT I**
**Breach of Fiduciary Duty and Duty of Loyalty**
**(Asserted Against Swisher)**

45. AFC repeats and realleges paragraphs 1 through 44 of this Complaint as though fully set forth herein.

46. From approximately August 1, 2021, through June 15, 2026, Swisher served as AFC's Project Manager.

47. AFC entrusted Swisher with responsibility for quoting and designing projects, ordering parts and materials, overseeing subcontractors, communicating with customers, vendors, and referral sources, and maintaining AFC's project files and other property.

48. By virtue of his employment and agency relationship, Swisher owed AFC fiduciary duties of fidelity, loyalty, good faith, and candor in all matters within the scope of his employment.

49. Those duties required Swisher to act in AFC's interests, disclose material conflicts, refrain from competing with AFC during his employment, refrain from diverting or intentionally impairing AFC's customers and business opportunities for his own benefit, and refrain from misusing or appropriating AFC's property and confidential information.

50. While continuing to work for and receive compensation, bonuses, and benefits from AFC, Swisher went beyond preliminary preparation and acted adversely to AFC's interests to advance or benefit himself and FDC.

51. Approximately one month before his resignation, AFC assigned Swisher to survey 72 Suncoast Credit Union locations in Florida and develop that opportunity on AFC's behalf. AFC paid the expenses associated with that assignment and entrusted Swisher to advance AFC's interests.

52. Instead of faithfully pursuing the opportunity for AFC, Swisher contacted the individual who generated the lead and represented that AFC would be "too expensive" and was unlikely to obtain the work.

53. At the time of that communication, Swisher had formed FDC and obtained licenses enabling FDC to compete with AFC in Illinois and Florida.

54. Swisher did not disclose his ownership or control of FDC, his competing interest in the Suncoast opportunity, or his resulting conflict of interest to AFC.

55. On information and belief, Swisher intended to impair or divert AFC's pursuit of the Suncoast opportunity for the benefit of himself or FDC.

56. In April 2026, while still employed by AFC, Swisher coordinated materials and work for the Cadet strainer project at Buckman using AFC's vendor relationships and resources.

57. AFC subsequently discovered vendor communications, an invoice for materials delivered to the Buckman site, and a April 23, 2026 Home Depot charge for $480.15, but AFC has been unable to locate records showing that the work was properly opened, processed, invoiced, or collected for AFC's benefit.

58. On information and belief, Swisher concealed, failed to account for, impaired, or diverted Buckman-related work, revenue, or business opportunities that belonged to AFC.

59. Based on the June 8, 2026 communication described above and Ryan Schaff's role in forming and operating FDC, AFC alleges on information and belief that Swisher further breached his fiduciary duties by coordinating with Schaff concerning tools, equipment, materials, or other resources for FDC while Swisher remained employed by AFC.

60. Swisher further breached his duties by removing, retaining, destroying, or concealing physical AFC project files and other AFC property entrusted to him through his employment.

61. Immediately after Swisher's resignation, AFC discovered that multiple original hard-copy project files maintained or controlled by Swisher were missing, including AFC's files concerning Buckman.

62. On information and belief, Swisher removed, retained, transferred, destroyed, or concealed those physical files without authorization.

63. On June 15, 2026, approximately two minutes after submitting his immediate resignation and while AFC's devices remained in his possession or control, Swisher initiated or caused the deletion of AFC data from his company computer. Swisher also returned his AFC-issued cell phone wiped of substantially all user-accessible data.

64. On information and belief, Swisher deleted AFC's data to conceal his pre-resignation activities, conflicts of interest, and misuse of AFC's business opportunities and property and to deprive AFC of information that it would assist it going forward in providing services and support to customers for whom Swisher was formerly responsible.

65. Swisher's conduct was unauthorized, contrary to AFC's interests, and undertaken for the benefit of himself or FDC while AFC continued paying his compensation, bonuses, and benefits.

66. Swisher's breaches proximately caused AFC injury, including loss or impairment of customer relationships and business opportunities, disruption of ongoing projects, lost revenue and profits, and compensation paid during the period of Swisher's disloyalty.

WHEREFORE, AFC requests the Court to enter judgment in AFC's favor and against Swisher on this Count I as follows:

(a) Compensatory damages in an amount to be proven at trial;

(b) Disgorgement of compensation, bonuses, and benefits AFC paid Swisher during the period of his disloyalty;

(c) Disgorgement of profits or benefits obtained as a result of Swisher's breaches, to the extent not duplicative of relief awarded under another Count; and

(d) Prejudgment and post-judgment interest, taxable costs, and such other relief as the Court deems just and proper.

**COUNT II**
**Misappropriation of Trade Secrets Under the Illinois Trade Secrets Act,**
**765 ILCS 1065/1 *et seq.***
**(Asserted Against Swisher and FDC)**

67. AFC repeats and realleges paragraphs 1 through 44 of this Complaint as though fully set forth herein.

68. The Illinois Trade Secrets Act ("ITSA") defines a "trade secret" to include technical or nontechnical data, compilations, drawings, financial data, and lists of actual or potential customers or suppliers that derive economic value from not being generally known and are subject to reasonable efforts to maintain their secrecy or confidentiality. *See* 765 ILCS 1065/2(d).

69. The ITSA defines "misappropriation" to include acquisition of a trade secret by a person who knows or has reason to know that it was acquired through improper means, as well as the unauthorized disclosure or use of a trade secret by a person who used improper means to acquire it or knew or had reason to know that the information was obtained through a person who owed a duty to maintain its secrecy or limit its use. *See* 765 ILCS 1065/2(b)(1)-(2).

70. The ITSA defines "improper means" to include theft, misrepresentation, breach or inducement of a breach of a confidential relationship or other duty to maintain secrecy or limit use, and espionage through electronic or other means. *See* 765 ILCS 1065/2(a).

71. AFC owns nonpublic information and compilations used in its fire-protection business (collectively, the "AFC Trade Secrets"), whether maintained electronically or in hard copy, including:

a. compilations concerning AFC's current and prospective clients that identify client decision-makers, site-specific requirements, project histories, anticipated work, purchasing practices, and referral sources;

b. nonpublic project-specific technical and commercial information, including project scopes, system configurations, drawings, site photographs, inspection findings, reports, and proposed solutions;

c. nonpublic pricing and bidding information, including costs, margins, labor estimates, vendor and subcontractor pricing, bidding assumptions, and project quotes;

d. nonpublic vendor and subcontractor information, including contacts, capabilities, negotiated pricing and terms, and selection information; and

e. nonpublic information concerning AFC's longstanding Grainger referral and billing-agent relationship, including its referral processes, contacts, opportunities, and billing procedures.

72. AFC developed the AFC Trade Secrets through years of client relationships, project performance, site inspections, pricing experience, vendor and subcontractor relationships, and its Grainger referral relationship.

73. The AFC Trade Secrets are not generally known or readily ascertainable through public sources and could not be duplicated by a competitor without substantial time, effort, expense, and relationship development.

74. The AFC Trade Secrets provide AFC with a competitive advantage by allowing it to identify and evaluate prospective work, understand client requirements and project histories, formulate competitive pricing, select vendors and subcontractors, and develop technical and commercial proposals more efficiently than competitors lacking that information.

75. AFC took reasonable measures to protect the AFC Trade Secrets, including limiting employee access based on job responsibilities and business need, using password-protected computer systems and company-controlled devices, maintaining project and customer records on AFC-controlled systems, authorizing access and use only for AFC business, and requiring employees to return AFC files, records, electronic data, devices, and materials upon separation.

76. Swisher obtained access to the AFC Trade Secrets solely through his employment as AFC's Project Manager and solely for the purpose of performing work for AFC.

77. Swisher's authority did not extend to copying, removing, retaining, disclosing, or using the AFC Trade Secrets for himself, FDC, or any other non-AFC purpose.

78. On information and belief, after forming FDC and while still employed by AFC, Swisher copied, removed, or retained AFC Trade Secrets for purposes unrelated to AFC and for the benefit of himself or FDC.

79. The AFC Trade Secrets acquired or retained by Swisher included nonpublic Buckman reports and project information, nonpublic information developed through AFC's survey of 72 Suncoast Credit Union sites, and AFC's nonpublic client, pricing, project, vendor, subcontractor, and Grainger-sourced information.

80. On information and belief, Swisher acquired, retained, disclosed, or used AFC Trade Secrets by:

a. Using or relying on nonpublic Buckman project, report, customer, and vendor information in communications or work concerning Buckman that was not recorded or processed for AFC's benefit;

b. acquiring or retaining nonpublic information developed through AFC's Suncoast Credit Union survey for a purpose unrelated to AFC; and

c. using AFC's nonpublic client, pricing, project, vendor, subcontractor, or Grainger-sourced information to compete through FDC.

81. In connection with his resignation, Swisher wiped the AFC-issued computer and cell phone used during his employment. AFC thereafter discovered that AFC project files, reports, and other information accessed by Swisher were missing or unavailable.

82. These circumstances evidence and conceal Swisher's unauthorized acquisition, retention, disclosure, or use of AFC Trade Secrets and prevent AFC from determining the full extent of the misappropriation.

83. On information and belief, FDC acquired, received, or used AFC Trade Secrets through Swisher.

84. FDC knew or had reason to know that the AFC Trade Secrets came from AFC and were obtained through Swisher's employment and duties to AFC because Swisher formed and controlled FDC while employed by AFC and used the information to conduct the same type of fire-protection work for which AFC developed it.

85. AFC did not consent, expressly or impliedly, to Swisher's or FDC's acquisition, retention, disclosure, or use of the AFC Trade Secrets outside Swisher's authorized work for AFC.

86. Swisher's and FDC's misappropriation has caused AFC actual loss, including loss of access to project information, lost or impaired business opportunities, lost revenue, and threatened competitive injury. Swisher and FDC have obtained or stand to obtain unjust enrichment, including avoided development costs, a competitive head start, and revenues or profits derived from their unauthorized acquisition, disclosure, or use of the AFC Trade Secrets.

87. AFC faces threatened ongoing misappropriation because Swisher has not accounted for the missing AFC Trade Secrets or all copies thereof, Swisher and FDC operate a directly competing business, and Swisher wiped AFC's devices in a manner that concealed the scope of his conduct.

88. Swisher's and FDC's misappropriation was willful and malicious.

WHEREFORE, AFC requests the Court to enter judgment in AFC's favor and against Swisher and FDC on this Count II as follows:

(a) Entering temporary, preliminary, and permanent injunctive relief under 765 ILCS 1065/3 prohibiting Swisher and FDC from acquiring, using, or disclosing AFC Trade Secrets;

(b) Requiring Swisher and FDC to preserve, identify, and account for all AFC Trade Secrets and copies in their possession, custody, or control and, following appropriate forensic preservation, to return to AFC materials and permanently delete them from all personal or FDC devices, accounts, and storage media;

(c) Awarding AFC damages for AFC's actual loss, unjust enrichment not otherwise taken into account, or a reasonable royalty, as permitted by 765 ILCS 1065/4(a);

(d) Awarding exemplary damages for willful and malicious misappropriation under 765 ILCS 1065/4(b); and

(e) Awarding reasonable attorneys' fees under 765 ILCS 1065/5, taxable costs, prejudgment and post-judgment interest, and such other relief as the Court deems just and proper.

**COUNT III**
**Misappropriation of Trade Secrets Under the Federal Defend Trade Secrets Act, 18 U.S.C. § 1836(b)**
**(Asserted Against Swisher and FDC)**

89. AFC repeats and realleges paragraphs 1 through 44 of this Complaint as though fully set forth herein.

90. "American law recognizes that the protection of trade secrets results in substantial benefits to businesses and society. Trade secret law promotes 'the efficient operation of industry' by affording those who invested time, capital, or effort into securing trade secrets lawfully to enjoy whatever remunerative benefits these secrets may entail." *WWMAP, LLC v. Birth Your Way Midwifery*, 711 F. Supp. 3d 1313, 1318 (N.D. Fla. 2024) (citing *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 493 (1974)).

91. A plaintiff is entitled to damages under the Defend Trade Secrets Act where "1. plaintiff owned a trade secret; 2. the defendant misappropriated plaintiff's trade secret; and 3. the misappropriated trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." *Id.* at 1319. The term "trade secret" is defined broadly. *Id.* (citing 18 U.S.C. § 1839(3)).

92. AFC owns the AFC Trade Secrets – nonpublic information and compilations used in its fire-protection business – whether maintained electronically or in hard copy, including:

a. compilations concerning AFC's current and prospective clients that identify client decision-makers, site-specific requirements, project histories, anticipated work, purchasing practices, and referral sources;

b. nonpublic project-specific technical and commercial information, including project scopes, system configurations, drawings, site photographs, inspection findings, reports, and proposed solutions;

c. nonpublic pricing and bidding information, including costs, margins, labor estimates, vendor and subcontractor pricing, bidding assumptions, and project quotes;

d. nonpublic vendor and subcontractor information, including contacts, capabilities, negotiated pricing and terms, and selection information; and

e. nonpublic information concerning AFC's longstanding Grainger referral and billing-agent relationship, including its referral processes, contacts, opportunities, and billing procedures.

93. AFC developed the AFC Trade Secrets through years of client relationships, project performance, site inspections, pricing experience, vendor and subcontractor relationships, and its Grainger referral relationship.

94. The AFC Trade Secrets are not generally known or readily ascertainable through public sources and could not be duplicated by a competitor without substantial time, effort, expense, and relationship development.

95. The AFC Trade Secrets provide AFC with a competitive advantage by allowing it to identify and evaluate prospective work, understand client requirements and project histories, formulate competitive pricing, select vendors and subcontractors, and develop technical and commercial proposals more efficiently than competitors lacking that information.

96. The AFC Trade Secrets are related to products and services that AFC uses in, and intends for use in, interstate commerce. AFC performs and solicits fire-protection work from

clients across multiple states, including Illinois, Florida, Missouri, and Arizona, and sources materials and equipment from national vendors and suppliers, including Grainger and Ferguson, in connection with that interstate work.

97. AFC took reasonable measures to protect the AFC Trade Secrets, including limiting employee access based on job responsibilities and business need, using password-protected computer systems and company-controlled devices, maintaining project and customer records on AFC-controlled systems, authorizing access and use only for AFC business, and requiring employees to return AFC files, records, electronic data, devices, and materials upon separation.

98. Swisher obtained access to the AFC Trade Secrets solely through his employment as AFC's Project Manager and solely for the purpose of performing work for AFC.

99. Swisher's authority did not extend to copying, removing, retaining, disclosing, or using the AFC Trade Secrets for himself, FDC, or any other non-AFC purpose.

100. On information and belief, after forming FDC and while still employed by AFC, Swisher copied, removed, or retained AFC Trade Secrets for purposes unrelated to AFC and for the benefit of himself or FDC.

101. The AFC Trade Secrets acquired or retained by Swisher included nonpublic Buckman reports and project information, nonpublic information developed through AFC's survey of 72 Suncoast Credit Union sites, and AFC's nonpublic client, pricing, project, vendor, subcontractor, and Grainger-sourced information.

102. On information and belief, Swisher acquired, retained, disclosed, or used AFC Trade Secrets by:

a. Using or relying on nonpublic Buckman projects, report, customer, and vendor information in communications or work concerning Buckman that was not recorded or processed for AFC's benefit;

b. acquiring or retaining nonpublic information developed through AFC's Suncoast Credit Union survey for a purpose unrelated to AFC; and

c. using AFC's nonpublic client, pricing, project, vendor, subcontractor, or Grainger-sourced information to compete through FDC.

103. In connection with his resignation, Swisher wiped the AFC-issued computer and cell phone used during his employment. AFC thereafter discovered that AFC project files, reports, and other information accessed by Swisher were missing or unavailable.

104. These circumstances evidence and conceal Swisher's unauthorized acquisition, retention, disclosure, or use of AFC Trade Secrets and prevent AFC from determining the full extent of the misappropriation.

105. On information and belief, FDC acquired, received, or used AFC Trade Secrets through Swisher.

106. FDC knew or had reason to know that the AFC Trade Secrets came from AFC and were obtained through Swisher's employment and duties to AFC because Swisher formed and controlled FDC while employed by AFC and used the information to conduct the same type of fire-protection work for which AFC developed it.

107. AFC did not consent, expressly or impliedly, to Swisher's or FDC's acquisition, retention, disclosure, or use of the AFC Trade Secrets outside Swisher's authorized work for AFC.

108. Swisher's and FDC's misappropriation has caused AFC actual loss, including loss of access to project information, lost or impaired business opportunities, lost revenue, and

threatened competitive injury. Swisher and FDC have obtained or stand to obtain unjust enrichment, including avoided development costs, a competitive head start, and revenues or profits derived from their unauthorized acquisition, disclosure, or use of the AFC Trade Secrets.

109. AFC faces threatened ongoing misappropriation because Swisher has not accounted for the missing AFC Trade Secrets or all copies thereof, Swisher and FDC operate a directly competing business, and Swisher wiped AFC's devices in a manner that concealed the scope of his conduct.

110. Swisher's and FDC's misappropriation was willful and malicious.

WHEREFORE, AFC requests the Court to enter judgment in AFC's favor and against Swisher and FDC on this Count III as follows:

(a) Entering temporary, preliminary, and permanent injunctive relief prohibiting Swisher and FDC from acquiring, using, or disclosing AFC Trade Secrets pursuant to 18 U.S.C. § 1836(b)(3)(A);

(b) Requiring Swisher and FDC to preserve, identify, and account for all AFC Trade Secrets and copies in their possession, custody, or control and, following appropriate forensic preservation, to return to AFC materials and permanently delete them from all personal or FDC devices, accounts, and storage media;

(c) Awarding AFC damages for AFC's actual loss, unjust enrichment not otherwise taken into account in computing actual loss, or a reasonable royalty, as permitted by 18 U.S.C. § 1836(b)(3)(B);

(d) Awarding exemplary damages for willful and malicious misappropriation under 18 U.S.C. § 1836(b)(3)(C); and

(e) Awarding reasonable attorneys' fees under 18 U.S.C. § 1836(b)(3)(D), taxable costs, prejudgment and post-judgment interest, and such other relief as the Court deems just and proper.

**COUNT IV**
**Conversion**
**(Asserted Against Swisher)**

111. AFC repeats and realleges paragraphs 1 through 44 of this Complaint as though fully set forth herein.

112. AFC owns and has the absolute and unconditional right to immediate possession of specifically identifiable tangible personal property, including AFC-purchased hand tools, drills, sprinkler and pipe tools, and other equipment ordered, obtained, or used by Swisher for AFC business.

113. AFC also owns and has the absolute and unconditional right to immediate possession of original physical project files, company records, and reports maintained at AFC's offices, including original physical files relating to Buckman.

114. Following Swisher's resignation, AFC discovered that AFC-purchased tools and equipment had not been returned and that original physical project files, including Buckman files, were missing from AFC's offices.

115. AFC demanded that Swisher return all files, documents, electronic data, records, and materials belonging to AFC, including physical project files removed from AFC's premises and AFC property in his possession, custody, or control.

116. Swisher failed or refused to return the demanded tangible property, and AFC remains deprived of its possession and use.

117. Swisher wrongfully and without authorization assumed control, dominion, or ownership over AFC's tangible property by removing, retaining, concealing, transferring, destroying, or refusing to return AFC-purchased tools and equipment and original physical project files.

118. AFC has been damaged by Swisher's conversion, including the value of the converted property at the time of conversion and the loss of its possession and use.

119. AFC is entitled to the return of any converted property remaining in Swisher's possession, custody, or control or, to the extent the property cannot be returned, damages equal to its value at the time of conversion.

120. AFC pleads this Count only to the extent the property and losses alleged in this Count are independent of, and not displaced by, AFC's claim for misappropriation of trade secrets under the Illinois Trade Secrets Act.

WHEREFORE, AFC requests the Court to enter judgment in AFC's favor and against Swisher on this Count IV as follows:

(a) Return of all converted tangible AFC property remaining in Swisher's possession, custody, or control;

(b) Alternatively, compensatory damages in an amount to be proven at trial, including the value of the property converted that cannot be returned and allowable loss-of-use damages;

(c) Prejudgment and post-judgment interest, taxable costs, and such other relief as the Court deems just and proper.

**COUNT V**
**Violation of the Computer Fraud and Abuse Act,**
**18 U.S.C. §§ 1030(a)(5)(A) and 1030(g)**
**(Asserted Against Swisher)**

121. AFC repeats and realleges paragraphs 1 through 44 of this Complaint as though fully set forth herein.

122. AFC issued Swisher a company computer and company cell phone for use in performing work for AFC.

123. AFC owned the devices and controlled the permissible use of the devices and the AFC data, programs, systems, and information maintained on or accessible through them.

124. The company computer and company cell phone were connected to the Internet and used for electronic communications with AFC's clients, vendors, and other persons within and outside Illinois. Each device was therefore a "protected computer" within the meaning of 18 U.S.C. § 1030(e)(2)(B).

125. AFC authorized Swisher to use the devices only to conduct AFC business. AFC did not authorize Swisher to erase, delete, destroy, overwrite, wipe, factory-reset, or otherwise impair or render unavailable AFC data, programs, system configurations, or information maintained on or accessible through the devices.

126. When AFC entrusted the devices to Swisher, they were operational and contained or provided access to AFC business information, including project information, customer communications, pricing communications, vendor and subcontractor communications, electronic mail, documents, and system configurations.

127. Swisher remained in possession or control of the devices immediately before returning them to AFC following his resignation. AFC did not direct or authorize Swisher to wipe or factory-reset either device.

128. Upon receiving the devices from Swisher, AFC discovered that the devices had been wiped, factory-reset, overwritten, or otherwise cleared of AFC data, programs, system configurations, and information.

129. A forensic examination showed that deletion of data from the company computer began on June 15, 2026, at approximately 6:04 a.m., approximately two minutes after Swisher submitted his immediate resignation.

130. On information and belief, while the devices remained in his possession or control and before returning them to AFC, Swisher knowingly caused the transmission and execution of one or more programs, information, codes, or commands—including erase, wipe, deletion, overwrite, or factory-reset commands—on the devices.

131. As a result of that conduct, Swisher intentionally caused damage without authorization to AFC's protected computers by impairing the integrity or availability of AFC's data, programs, system configurations, and information, within the meaning of 18 U.S.C. §§ 1030(a)(5)(A) and 1030(e)(8).

132. Swisher's conduct deprived AFC of access to information maintained on the devices and required AFC to respond to the incident, determine the nature and extent of the deletion and impairment, assess whether AFC's computers, accounts, or information remained compromised, attempt to recover or restore AFC data and systems, and reconstruct unavailable information.

133. During a one-year period, AFC incurred reasonable costs and losses aggregating at least $5,000 in responding to Swisher's conduct, conducting a forensic damage assessment, attempting to recover and restore affected data and systems, reconstructing unavailable information, and addressing interruptions to AFC's access to its computer data and services.

134. The qualifying losses alleged in this Count arise from the impairment and unavailability of AFC's computers and data and AFC's resulting incident-response, damage-assessment, restoration, reconstruction, and service-interruption costs. Those losses do not include damages based solely on the disclosure, use, or competitive value of AFC's trade secrets or the value of converted tangible property.

WHEREFORE, AFC requests the Court to enter judgment in AFC's favor and against Swisher on this Count V as follows:

(a) Awarding compensatory economic damages in an amount to be proven at trial, including qualifying incident-response, damage-assessment, restoration, reconstruction, and service-interruption costs; and

(b) Awarding appropriate injunctive relief, prejudgment and post-judgment interest, taxable costs, and such other relief as the Court deems just and proper.

**AFC DEMANDS TRIAL BY JURY ON ALL ISSUES SO TRIABLE**

Dated: August 05, 2026

Respectfully submitted,

**AUTOMATIC FIRE CONTROLS, INC.**

By: /s/ *Christine E. Skoczylas*
One of its Attorneys

Christine E. Skoczylas (#6293811)
*christine.skoczylas@btlaw.com*
Christopher Burton (#6338551)
*christopher.burton@btlaw.com*
BARNES & THORNBURG LLP
One North Wacker Drive, Suite 4400
Chicago, Illinois 60606
tel: (312) 357-1313
fax: (312) 759-5646

*Attorneys for Plaintiff Automatic Fire Controls, Inc.*